IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | |
|---|---|
| MICHAEL GRIDER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 04-6076-CV-SJ-SOW |
| ) | |
| LOWE'S HOME CENTERS INC., ) | |
| ) | |
| Defendant. ) | |

ORDER

Before the Court are defendant's Motion for Summary Judgment (Doc. #32), defendant's Suggestions in Support, plaintiff's Suggestions in Opposition, and defendant's Reply. For the reasons stated below, defendant's motion is denied.

I. Background

Plaintiff Michael Grider has filed this lawsuit claiming that defendant Lowe's Home Centers, Inc. (hereinafter "Lowe's") discriminated and retaliated against him and wrongfully terminated his employment on June 30, 2003, for asserting his rights under the Missouri Workers' Compensation Law in July of 1999. Lowe's states that plaintiff Grider was discharged because he violated the Lowe's anti-harassment policy.

Defendant Lowe's moves for summary judgment on plaintiff's claims. The undisputed material facts relevant to the pending motion are as follows: plaintiff began working for defendant Lowe's in its St. Joseph, Missouri store in 1996 as a receiving specialist. At the time he voluntarily resigned from Lowe's to accept another job opportunity with Atchison Casting, plaintiff Grider was a department manager in the building materials department at Lowe's. After working for Atchison Casting for two weeks, plaintiff Grider returned to Lowe's and was

employed full-time as a customer service associate in the receiving department. Plaintiff Grider held this position for approximately a year and half before suffering an on-the-job injury in June of 1999.

A.      Lowe's Policies

On September 14, 1998, plaintiff signed a one-page contract of employment with Lowe's. In signing the contract, plaintiff acknowledged that he had read and understood the following: I. Notice of Lowe's Policies; II. Lowe's Orientation Workbook; III. Lowe's Code of Ethics; IV. Data Security Statement; and V. Lowe's Contract of Employment. The contract included the statement: " DISCRIMINATION, INCLUDING SEXUAL HARASSMENT, BY SUPERVISORS, FELLOW EMPLOYEES OR CUSTOMERS IS STRICTLY AGAINST POLICY AND WILL NOT BE TOLERATED." The contract specified that plaintiff was an at-will employee whose employment was for an indefinite period of time and was terminable at the will of either party without cause or notice.

Lowe's classifies employee's violations of its policies as Class A, B, or C violations. Plaintiff Grider was aware that Lowe's had such classifications of violations. Employees of Lowe's are informed that a Class A violation is so severe that on a first offense, an individual's employment *can* be terminated. Plaintiff adds that it is left to a manager's discretion as to which class a particular offense is designated. It is undisputed, however, that verbal or physical abuse, or other abusive behavior, towards employees on company property, as well as violations of Lowe's "no harassment" policy, are considered Class A violations.

In addition, plaintiff Grider was familiar with Lowe's sexual harassment policy. Plaintiff was trained on Lowe's anti-harassment policy more than once. Grider participated in a three-day

training course that addressed harassment. Plaintiff knew that sexual harassment was a Class A violation which could lead to immediate termination of his employment.

Lowe's claims that it normally terminates the employment of employees who engage in Class A violations on the first offense. Plaintiff Grider responds that this asserted fact is controverted. Grider claims that there are employees of Lowe's who have engaged in Class A violations and not been terminated on the first offense.

Next, Lowe's states that despite what a complaining party or employee may desire, Lowe's policies provide direction on determining how to respond to policy violations engaged in by employees. Plaintiff Grider contends that this statement is controverted because Lowe's policies allow human resources personnel and managers to use discretion in responding to policy violations.

B.      Plaintiff Grider's Injury and Subsequent Workers' Compensation Claim

In June of 1999, plaintiff suffered a leg injury while at work at Lowe's. His right leg was crushed when a box slid off a garbage truck. After the accident, plaintiff took a leave of absence from work for approximately one year. During his leave of absence, plaintiff received benefits. After approximately one year off, plaintiff returned to his employment at Lowe's with restrictions. These restrictions included no long-term standing, no long-term sitting, and no lifting. Plaintiff worked for Lowe's for approximately three more years with those same restrictions.

Defendant Lowe's states that at no time did Lowe's interfere with plaintiff's ability to work with his listed restrictions. Plaintiff disputes this statement.

In early 2003, plaintiff asked to take a demotion from Assistant Store Manager to a

3

Department Manager position. Plaintiff claims that he asked for the demotion because the former position required him to be on his feet constantly and to work in excess of fifty hours per week which was too much given his injury. In an e-mail to Rodney Lee, defendant Lowe's Area Human Resources Manager, dated January 25, 2003, plaintiff Grider advised Lee of his injury and asked for Lee's assistance in obtaining the voluntary demotion because of his injury-related restrictions.

By March of 2003, the St. Joseph Store Manager, Vahn Klinke, and Terry Burleson, defendant Lowe's District Manager, were aware of the injury plaintiff had suffered. They were also aware of plaintiff's request to take a voluntary demotion.

On June 13, 2003, plaintiff sent an e-mail to Rodney Lee, titled "concern." This e-mail was sent at 7:00 a.m. and addressed certain concerns plaintiff had about his supervisor, Klinke. In the e-mail, plaintiff stated that he thought Klinke was treating him unfairly, calling him lazy for stepping down from his Assistant Manager position. Plaintiff stated that he felt it was unfair that he would be required to take a vacation day to attend a mediation related to his pending workers' compensation claim. Plaintiff Grider also reported that Klinke said he would get him during inventory for having to take a day to attend the mediation. In the e-mail, plaintiff also complained that Klinke asked him why he thought Lowe's was responsible for his injury. Plaintiff stated, "I feel like there is tension because of comp claim . . . ."

Upon receiving the e-mail, Lee immediately forwarded it to his superiors, Regional Human Resources Director Joe Dodson and District Manager Burleson. Burleson has testified that he does not recall what, if anything, he did in response to plaintiff's e-mail.

On the following Monday, June 16, 2003, at 7:28 a.m., Dodson e-mailed Lee and

Burleson in response to plaintiff's e-mail. Dodson stated, "Terry, when is Vahn [Klinke] going to learn his mouth is going to get him in a place he does not want to be in? If he wants to work for someone else outside of Lowe's he is working diligently toward that goal."

In supporting its Motion for Summary Judgment, defendant Lowe's states that Klinke had received a letter at some point during January of 2003 requesting information about plaintiff's leg injury. According to defendant Lowe's, Klinke asked plaintiff about the injury because Klinke had no independent knowledge with which to respond to the letter as he was not employed at the St. Joseph store in 1999. Plaintiff Grider states that the only thing Klinke asked him was why Lowe's was responsible for the injury, that he did not ask him for information about the actual injury.

Dodson has testified that he does not recall or remember who investigated the issues raised by plaintiff Grider in his June 13, 2003 e-mail. Lee has testified that Burleson had the responsibility for addressing plaintiff's concerns. Lee stated that he knew Burleson spoke to Klinke, but he did not know any specifics of the conversation. Burleson testified at his deposition that he had no idea whether or not he got involved in responding to plaintiff's June 13th e-mail.

According to Klinke, he believes Lee called him about plaintiff Grider's June 13th e-mail. Klinke is not aware of anyone being interviewed as part of any investigation into plaintiff Grider's claims. Klinke was never written up because of his alleged comments to plaintiff Grider.

C. <u>Plaintiff Grider's Conversation With Sherri Nixon</u>

It is undisputed that on June 13, 2003, plaintiff Grider was alone with another Lowe's

5

employee, Sherri Nixon, at the back gate of the store. While Ms. Nixon was at the back gate, she mentioned that a delivery driver, Terry Vice, had called her and she wondered aloud to plaintiff Grider why Vice would have called her. Plaintiff Grider suggested that perhaps Vice was calling to ask her on a date. Ms. Nixon replied that she was not interested in dating delivery drivers. Apparently, Ms. Nixon had previously dated a delivery driver named Ryan.

At this point, Lowe's asserts that plaintiff Grider "volunteered that he had heard stories about Ms. Nixon." The Court notes that the deposition testimony cited by defendant Lowe's does not support the characterization that plaintiff Grider "volunteered" that he had heard stories about Ms. Nixon. It is undisputed that plaintiff Grider told Ms. Nixon that "he had heard about the size of [her] nipples, and he showed [her] with his pinky finger, that he had heard they're about the size of about the first knuckle, is where he pointed, about that size." Lowe's states that after making that comment to Ms. Nixon, plaintiff asked Ms. Nixon if she was turning red.

Ms. Nixon's deposition testimony reveals that she does not recall whether she asked plaintiff Grider what Ryan had said about her or whether plaintiff "just said" what Ryan had told him.

Plaintiff's version of the conversation at issue is that Sherri Nixon asked plaintiff what stories he had heard from her ex-boyfriend, Ryan. Plaintiff states that he did not volunteer the information. Plaintiff claims that in response to Ms. Nixon's question, he told Ms. Nixon that her ex-boyfriend "used to tell everybody that [her] nipples were that big" and then he showed Ms. Nixon how her ex-boyfriend used to describe it by using his pinky to demonstrate exactly like the ex-boyfriend had done it. Plaintiff Grider does not dispute that he asked Ms. Nixon if she was turning red, but adds that after that question, the subject was changed.

6

Ms. Nixon has testified that she did not feel that plaintiff was harassing her or trying to make her feel uncomfortable. Ms. Nixon did not feel that plaintiff was trying to create a hostile work environment for her.

It is undisputed that after the conversation between plaintiff Grider and Ms. Nixon, Ms. Nixon went back into the store and ran into Assistant Store Manager Natalee Fancher. Ms. Fancher was Ms. Nixon's direct supervisor. It is undisputed that Ms. Fancher asked Ms. Nixon if anything was wrong, because she thought Nixon looked "kind of funny." Nixon denied anything was wrong.

Approximately one hour later, Ms. Fancher saw Ms. Nixon again. Fancher again observed that Ms. Nixon was not acting like herself. At that point, Nixon stated that something was wrong and asked to talk to Fancher privately. Nixon told Fancher what plaintiff Grider had said about her nipples. Nixon asked Fancher to talk to plaintiff Grider and advise him not to say anything like that again. Plaintiff adds that Sherri Nixon told Fancher that all she wanted was for plaintiff not to talk about it and if he heard anyone else talking about it, to tell them to stop. Francher advised Nixon that she had to take Nixon's request that she confront plaintiff Grider "up the ladder."

Later that same day, Store Manager Vahn Klinke approached Ms. Nixon and asked if she had something she wanted to talk to him about. Ms. Nixon stated that she did not. Klinke stated that he had heard otherwise. Ms. Nixon asked if Klinke was referring to plaintiff and Klinke said that he was and asked Ms. Nixon to tell him what had happened. Ms. Nixon explained what had happened and told Klinke that she did not want plaintiff fired, that she only wanted him to refrain from talking about her nipples again. Klinke told Ms. Nixon that due to the sexual nature of

7

plaintiff Grider's comments, he had to involve Lowe's human resources department.

Klinke reported the conversation between plaintiff Grider and Ms. Nixon to Rodney Lee via e-mail. Lee received the e-mail on Monday, June 16, 2003.

The following week, plaintiff was on vacation. Soon after returning to work following his vacation, plaintiff Grider walked by Ms. Nixon at work and asked her "how the weather was." According to defendant, as plaintiff Grider asked this question, he glanced down at Ms. Nixon's breasts. Ms. Nixon testified that she does not recall whether plaintiff glanced at her breasts or not. Plaintiff denies glancing down at Sherri Nixon's breasts when asking her about the weather. According to plaintiff, Ms. Nixon's hair was wet and he assumed it was raining out when he asked her about the weather. Ms. Nixon's testimony confirms that her hair was wet at the time plaintiff asked her about the weather. Nixon did not report this comment to anyone until she was giving her statement to Rodney Lee.

According to Lowe's, generally, when a complaint is made by an employee, Lee, as the Area Human Resources Manager, is notified. Then, a decision is made between Lee, his supervisor (Dodson), the district manager, and the local human resources manager as to who will handle the investigation. Defendant Lowe's states that in this case, Dodson directed Lee to conduct the investigation. Normally, following an investigation, the Area Human Resources Manager makes determinations and reports back to the Regional Human Resources Director.

On June 20, 2003, Lee traveled to Lowe's St. Joseph store and conducted an investigation of plaintiff's alleged comments to Sherri Nixon. Ms. Nixon met with Lee. Lee asked Ms. Nixon to provide a written statement, explaining her version of the events that had transpired. Ms. Nixon provided a brief and general initial explanation. Lee then asked her to be more specific in

her description of the events. Ms. Nixon then added details to her initial statement. Lee also interviewed plaintiff Grider about the conversation at issue. Lee asked plaintiff to explain his version of what had happened and to write out a statement. Plaintiff Grider provided a written statement. Lee also interviewed Fancher and Klinke.

After he left the St. Joseph store, Lee reviewed all the statements he had collected during his investigation. He compiled an investigation report and made a recommendation to Dodson that plaintiff should be disciplined up to and including the termination of his employment.

Defendant Lowe's states that when Lee made his recommendation to Dodson, Lee was unaware of the status of plaintiff's workers' compensation claim. Plaintiff responds that this asserted fact is controverted because Lee was aware that he had filed a workers' compensation claim.

Plaintiff was terminated by Klinke on June 30, 2003. Defendant states that plaintiff's employment was terminated based upon his violation of Lowe's anti-harassment policy. Plaintiff disputes this reason for his termination. Plaintiff Grider informed Klinke that he thought the termination was wrong and that he was being terminated because "I had complained about workers' comp, needing time off for workers' comp."

It is undisputed that in June of 2003, Dodson, Burleson, Lee, and Klinke knew it was illegal to discriminate or retaliate against an employee because the employee was asserting workers' compensation rights. They also knew it was illegal to retaliate against employees for raising a concern that they were being discriminated against.

Sherri Nixon was surprised that plaintiff's employment was terminated. She has testified that she did not want or expect plaintiff Grider to be fired based upon their conversation.

9

It is uncontroverted that at least two other employees at the Lowe's store in St. Joseph have had their employment terminated for sexual harassment without prior discipline. Plaintiff Grider adds, however, that there are other employees within the same store who have been accused of sexual harassment and who have been disciplined, not terminated.

Dodson testified that managers have some discretion in considering the circumstances and deciding what is fair in a particular situation. Dodson also agreed that just because someone makes a comment about another person's body, it does not necessarily mean the employee would be terminated under defendant Lowe's policies.

On June 25, 2003, five days before plaintiff Grider was fired, Rodney Lee sent Dodson an e-mail acknowledging that plaintiff was "on workers' comp." In the e-mail, Lee stated to Dodson that he would inform plaintiff Grider that Lowe's would continue to meet its obligations under workers' compensation. Lee added, "I really don't think that he will put up a fight. He knows that he should not have engaged in this unacceptable conduct. However, on the other hand, since he is currently engaged in litergation [sic] he might get the bright ideal [sic] that he can win a EEOC case."

D.  Klinke's Harassment of Monica Mason

At the time of the conversation between plaintiff Grider and Sherri Nixon, Klinke had just received a written warning in response to a complaint of harassment by an employee named Monica Mason. The written Direction Letter to Klinke is dated June 6, 2003.

Mason's complaints against Klinke were that he requested that she come to his house on multiple occasions; that he made a statement on one occasion that he would be downstairs with the liquor; and that Klinke told Mason that if she said anything about these conversation, he was

10

going to fire her. Dodson investigated Mason's complaints about Klinke.

Defendant Lowe's claims that it cannot produce copies of any statements from either Mason or Klinke; however, Dodson has testified that he knows Klinke made a statement and believes there should be a statement from Mason.

Dodson recommended that Klinke receive a Direction Letter. Therefore, Klinke received a written warning for his comments to Monica Mason.

E.    Klinke's Comment to Sherri Nixon

On Memorial Day weekend in 2003, Klinke commented to Sherri Nixon that she owed plaintiff Grider a "big, wet, sloppy kiss." Nixon did not feel that this was an appropriate thing for the Store Manager to be saying to her. Nixon wrote an e-mail to Rodney Lee about this comment. No disciplinary action was taken against Klinke because of this comment.

F.    The Pearson-Gregory Incident

Plaintiff has identified an incident that occurred after his termination where a male employee touched a female employee in an unwelcome manner. The female employee became upset and reported the incident to defendant Lowe's Human Resources department. The male employee was not immediately fired. Instead, he was given a written warning.

II. Standard

A motion for summary judgment should be granted if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Rafos v. Outboard Marine Corp., 1 F.3d 707, 708 (8th Cir. 1993) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). The moving party bears the burden of bringing forward sufficient evidence to

11

establish that there are no genuine issues of material fact for trial and that the movant is entitled to summary judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party opposing a properly supported motion for summary judgment may not rest upon the allegations contained in the pleadings, "but must set forth specific facts showing there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In reviewing a motion for summary judgment, this Court must scrutinize the evidence in the light most favorable to the non-moving party, according the non-moving party the benefit of every factual inference and resolving any doubts as to the facts or existence of any material fact against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 (1970).

### III. Discussion

Plaintiff's wrongful discharge claim is based upon the anti-retaliation provision in Missouri's workers' compensation statute, Section 287.780, Mo. Rev. Stat. In Missouri, it is unlawful for an employer to discriminate or retaliate against an employee for asserting his or her rights under the Workers' Compensation Act. Section 287.780 provides, "No employer or agent shall discharge or in any way discriminate against any employee for exercising any of his rights under this chapter." Any employee who is discharged or discriminated against in violation of this provision is given the right to bring a civil action for damages against the employer. Id.

In order to establish a claim for retaliatory discharge under the Workers' Compensation Act, the plaintiff must establish: (1) plaintiff's status as an employee of defendant before injury; (2) plaintiff's exercise of a right granted by chapter 287; (3) the employer's discharge of or discrimination against plaintiff; and (4) an exclusive causal relationship between plaintiff's action and defendant's actions. Ralph v. Lewis Bros. Bakeries, Inc., 979 S.W.2d 509, 513 (Mo.

12

Ct. App. 1998)(quoting <u>Hansome v. Northwestern Cooperage Co.</u>, 679 S.W.2d 273, 275 (Mo. banc 1984)).

Defendant Lowe's argues that plaintiff cannot establish the second and fourth elements of a *prima facie* case. Lowe's takes the position that plaintiff Grider's assertion of rights was the filing of a workers' compensation claim in 1999 and that this act is too remote in time to be connected to his discharge in June of 2003. In addition, Lowe's contends that plaintiff cannot prove that his exercise of his workers' compensation rights was the exclusive reason for his discharge. The Court disagrees.

Plaintiff Grider sent an e-mail to defendant Lowe's human resources department on June 13, 2003, stating a complaint that his store manager, Klinke, was treating him unfairly and in a discriminatory manner because Klinke had become aware that plaintiff Grider had a workers' compensation claim pending. Grider's e-mail conveyed the information that Klinke had called plaintiff lazy for requesting a voluntary demotion to accommodate his injury-related work restrictions and that Klinke had questioned why Lowe's was responsible for the injury. Since Section 287.780, Mo. Rev. Stat., provides that a worker has the right to be free from discrimination and retaliation as he or she pursues a workers' compensation claim, a jury could find that plaintiff's e-mail to defendant Lowe's human resources department was an exercise of his rights under Missouri's workers' compensation law.

"Although timing alone cannot conclusively establish that an employee was discharged for exercising his rights under the Workers' Compensation Laws, proximity in time between the exercise of the right and the time of the firing is a factor to be considered." <u>Coleman v. Winning</u>, 967 S.W.2d 644, 648 (Mo. Ct. App. 1998). In this case, plaintiff Grider was terminated

13

seventeen days after complaining about Klinke's comments on his workers' compensation claim.

While defendant Lowe's relies on the sexual harassment issue to justify plaintiff Grider's termination, plaintiff Grider has identified a store manager and a store employee who both received written warnings in response to sexual harassment complaints under the same anti-harassment/Zero Tolerance policy. In fact, given the fact that the jury may believe plaintiff Grider's testimony that he only related to Sherri Nixon the comments her former boyfriend had made after she asked him to do so, the jury may find it questionable whether plaintiff engaged in any sexual harassment at all, let alone harassment on a level justifying immediate termination. It is apparent from the evidence identified by plaintiff Grider that Lowe's did not immediately terminate the employment of any employee who engaged in sexual harassment. Therefore, a jury issue arises as to whether plaintiff Grider was actually terminated because he complained about Klinke's harassment of him on the workers' compensation claim.

Defendant Lowe's again relies on the sexual harassment issue as a legitimate reason for plaintiff's termination and argues that plaintiff cannot demonstrate pretext. Again, the Court disagrees. Defendant Lowe's maintains that it had a "zero-tolerance policy" on sexual harassment and that neither the Court nor a jury should be permitted to second-guess its employment decisions; however, plaintiff Grider has identified evidence that raises questions about whether or not Lowe's actually utilized a "zero-tolerance policy" in response to sexual harassment claims. Only weeks before the Grider-Nixon conversation, Klinke had received a written warning for repeatedly asking a female employee to come to his house. Klinke also told Nixon she owed Grider a "big, wet, sloppy kiss," another comment by a store manager that could be construed as sexual harassment. More importantly, plaintiff has identified an incident that

14

occurred after his termination in which a male employee touched a female employee in an unwelcome manner. The female employee complained, yet the male employee received only a written warning in contrast to plaintiff's termination for relating a comment made by a female employee's former boyfriend, possibly at her request.

Also telling is defendant Lowe's complete lack of investigation into plaintiff Grider's complaint about Klinke in relation to his workers' compensation case. There is no evidence that Klinke was interviewed, questioned, or disciplined in response to plaintiff Grider's complaint to human resources. Instead, Rodney Lee sent an e-mail to his supervisor stating that he would inform plaintiff Grider that Lowe's intended to meet its obligations under the workers' compensation laws. Lee added, "I really don't think that he will put up a fight. He knows that he should not have engaged in this unacceptable conduct." A jury could find that Lee knew Lowe's was not handling plaintiff Grider's complaint properly, but instead using the conversation between Grider and Nixon as a pretext for firing Grider.

The reason for plaintiff Grider's termination remains as a fact issue to be decided by a jury. Plaintiff has identified sufficient evidence to present both a *prima facie* case and call into question defendant Lowe's stated reason for terminating his employment.

## IV.  Conclusion

Accordingly, for the reasons stated above, it is hereby

ORDERED that defendant's Motion for Summary Judgment (Doc. #32) is denied and this case remains set for trial.

/s/Scott O. Wright
SCOTT O. WRIGHT
Senior United States District Judge

Dated: 1-31-06